COLONIAL AMERICAN LIFE INSURANCE CO. *v.*
COMMISSIONER OF INTERNAL REVENUE

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR
THE FIFTH CIRCUIT

No. 88–396.   Argued April 18, 1989—Decided June 15, 1989

*Carolyn P. Chiechi* argued the cause for petitioner. With her on the briefs were *Margaret Milner Richardson, Francis M. Gregory, Jr., James V. Heffernan, Gordon O. Pehrson, Jr.,* and *George R. Abramowitz.*

*Michael R. Dreeben* argued the cause for respondent. With him on the brief were *Acting Solicitor General Bryson, Acting Assistant Attorney General Knapp, Deputy Solicitor General Wallace, Alan I. Horowitz, Gary R. Allen, David English Carmack,* and *Nancy G. Morgan.**

JUSTICE KENNEDY delivered the opinion of the Court.

The arcane but financially important question before us is whether ceding commissions paid by a reinsurance company to a direct insurer under a contract for indemnity reinsurance are fully deductible in the year tendered or instead must be amortized over the anticipated life of the reinsurance agreements.

I

This case involves the workings of the reinsurance industry. In order to spread the risks on policies they have written or to reduce required reserves, insurance companies commonly enter into reinsurance agreements. Under these agreements, the reinsurer pays the primary insurer, or "ceding company," a negotiated amount and agrees to assume the

---

*\*William B. Harman, Jr., Jack H. Blaine, John W. Holt,* and *John T. Adney* filed a brief for the American Council of Life Insurance et al. as *amici curiae* urging reversal.

ceding company's liabilities on the reinsured policies. In return, the reinsurer receives the future income generated from the policies and their associated reserve accounts.

Reinsurance comes in two basic types, assumption reinsurance and indemnity reinsurance. In the case of assumption reinsurance, the reinsurer steps into the shoes of the ceding company with respect to the reinsured policy, assuming all its liabilities and its responsibility to maintain required reserves against potential claims. The assumption reinsurer thereafter receives all premiums directly and becomes directly liable to the holders of the policies it has reinsured.

In indemnity reinsurance, which is at issue in this case, it is the ceding company that remains directly liable to its policyholders, and that continues to pay claims and collect premiums. The indemnity reinsurer assumes no direct liability to the policyholders. Instead, it agrees to indemnify, or reimburse, the ceding company for a specified percentage of the claims and expenses attributable to the risks that have been reinsured, and the ceding company turns over to it a like percentage of the premiums generated by the insurance of those risks.

Both the assumption and the indemnity reinsurer ordinarily pay an up-front fee, known as a "ceding commission," to the ceding company.[1] The issue in this case is whether ceding commissions for indemnity reinsurance may be deducted by the reinsurer in the year in which they are paid, or whether they must be capitalized over the estimated life of the underlying policies. Petitioner writes and reinsures life, accident, and health insurance. In 1975 and 1976, petitioner entered into four indemnity reinsurance agreements to rein-

---

[1] There is a form of indemnity reinsurance known as risk-premium, or yearly-renewable-term, reinsurance that does not involve ceding commissions. Under risk-premium reinsurance, much like a normal insurance policy, the ceding company typically pays an annual premium to the reinsurer in return for which the reinsurer promises to reimburse the ceding company should identified losses arise.

sure blocks of life insurance policies written by Transport Life Insurance Company, the ceding company. The agreements required petitioner to indemnify Transport for 76.6% of Transport's liabilities under the block of reinsured policies.[2] Petitioner also contracted to pay ceding commissions of $680,000 for the 1975 pair of agreements and $852,000 for the 1976 pair of agreements. In addition, petitioner paid Transport a "finder's fee" of $13,600 in 1975, which the parties agree is subject to the same tax treatment as the ceding commissions.

On its federal income tax returns for 1975 and 1976, petitioner claimed deductions for the full amount of the ceding

---

[2] The parties structured the agreements so as to require the actual transfer of only a small amount of cash. To understand this arrangement, it is necessary to touch on the differences between the two types of coinsurance, which is the most common form of indemnity reinsurance. These two types are conventional coinsurance and modified coinsurance. The two differ in their effect on the reserves that insurance companies are required to maintain against potential liabilities, and which represent essentially an estimate of the present value of future benefits less future premiums. In a conventional coinsurance agreement, the ceding company pays a "reinsurance commission" to the reinsurer in an amount equal to the reserves that the reinsurer must establish to support the liabilities assumed; in a modified coinsurance agreement, the ceding company continues to maintain the reserves and transfers to the reinsurer only the investment income that the reserves generate. Insurance companies frequently pair conventional and modified coinsurance agreements in such a proportion that the ceding commission is roughly equal to the reinsurance commission, with the net effect being that very little money changes hands. So it was in this case: petitioner entered into two modified coinsurance agreements covering 70% of a block of policies, and two conventional coinsurance agreements covering 6.6% of the same block of policies; the total ceding commissions were designed to be roughly equal to the reserves petitioner was required to establish under the conventional agreements, with the result being that petitioner actually paid Transport a total of less than $5,000. The parties elected to treat the modified coinsurance agreements for tax purposes as if they were conventional coinsurance agreements, which the Code then permitted. 26 U. S. C. § 820 (1976 ed.). Thus, the difference between modified and conventional coinsurance agreements is, mercifully, of no legal significance in this case.

commissions and the finder's fee. The Commissioner disallowed the deductions, concluding that the ceding commissions and finder's fee had to be capitalized and amortized over the useful life of the reinsurance agreements, a period later stipulated to be seven years. Petitioner then filed for review in the Tax Court, which agreed with petitioner that the ceding commissions could be deducted in full in the year of payment.

The Court of Appeals for the Fifth Circuit reversed, holding that ceding commissions are not currently deductible. 843 F. 2d 201 (1988). The Court of Appeals reasoned that ceding commissions represent payments to acquire an asset with an income producing life that extends substantially beyond one year, and that under fundamental principles of taxation law, such payments must be amortized over the estimated life of the asset.

To resolve a conflict in the Courts of Appeals,[3] we granted certiorari. 488 U. S. 980 (1988).

## II

This case is initially a battle of analogies. The tax treatment of life insurance companies is prescribed in Part I of Subchapter L of the Internal Revenue Code of 1954, 26 U. S. C. §§ 801–820 (1970 ed. and Supp. V). Given that these provisions do not specify in explicit terms whether ceding commissions for indemnity reinsurance may be taken as current deductions, the parties each argue that the tax treatment of allegedly analogous payments should be controlling. Petitioner analogizes to the tax treatment of "agents' commissions and other expenses incurred by a life insurance company in issuing directly-written insurance." Brief for Petitioner 21. Such expenses of primary insurers are currently deductible under § 809(d)(12) of the Code, which incorporates

---

[3] Compare *Prairie States Life Ins. Co.* v. *United States.* 828 F. 2d 1222 (CA8 1987) (requiring capitalization), with *Merit Life Ins. Co.* v. *Commissioner,* 853 F. 2d 1435 (CA7 1988) (permitting current deduction).

the allowance for "ordinary and necessary" business expenses under § 162(a).[4] Petitioner argues that indemnity reinsurance is in effect a direct insurance agreement between the reinsurer and the ceding company. Parties to an indemnity reinsurance agreement, petitioner points out, stand in the same relation to one another as do the parties to a conventional insurance policy: in return for a premium, the reinsurer agrees to reimburse the ceding company in the event the company becomes liable for certain designated risks. Petitioner reasons that just as a direct insurer may currently deduct the commissions it pays to acquire policies, so should an indemnity reinsurer be able to deduct currently the ceding commissions it expends to acquire business.

Respondent counters with an analogy to assumption reinsurance, the ceding commissions for which, it is well established, must be capitalized and amortized. See 26 CFR § 1.817–4(d) (1988). "[T]here is essentially no economic difference," respondent argues, "between a ceding commission paid in an assumption reinsurance transaction and one paid in an indemnity reinsurance transaction." Brief for Respondent 19–20. In both cases, according to respondent's analysis, the ceding commission represents payment for the right to share in the future income stream from the reinsured policies. Id., at 18–19.

As the parties' dispute makes clear, indemnity reinsurance bears some formal and functional similarities to both direct insurance and assumption reinsurance. But the salient comparison is between ceding commissions in indemnity reinsurance and their asserted analogues in the other two forms of insurance. At this level of inquiry, we agree with respondent that the analogy to ceding commissions in assumption re-

---

[4] Although the Code does not explicitly permit primary insurers to deduct agent's commissions in the year in which they are paid, such deductions have been permitted historically, and Congress has recognized and approved of the historic practice. See S. Rep. No. 291, 86th Cong., 1st Sess., 7, 9 (1959); H. R. Rep. No. 98–432, p. 1428 (1984).

insurance is the more compelling one. Although indemnity reinsurance is different from assumption reinsurance in some important ways, none of them go to the function and purpose of the ceding commissions. Whether the reinsurer assumes direct liability to the policyholder in no way alters the economic role that the ceding commissions play in both kinds of transactions. The only rational business explanation for the more than $1,500,000 that petitioner paid in ceding commissions to Transport is that petitioner was investing in the future earnings on the reinsured policies. The ceding commissions thus are not administrative expenses on the order of agents' commissions in direct insurance; rather, they represent part of the purchase price to acquire the right to a share of future profits.

The parallels between ceding commissions in indemnity insurance and agents' commissions in direct insurance, on the other hand, are chiefly nominal. The commission paid to the insurance agent in a direct insurance setting is an administrative expense to remunerate a third party who helps to facilitate the sale; the agent's commission is akin to a salary, and to other sales expenses of writing new policies, such as administrative overhead. In the reinsurance setting, by contrast, the ceding company owns the asset it is selling, and the reinsurer pays a substantial "commission" as part of the purchase price to induce the ceding company to part with the asset it has created; the payment, in other words, is for the asset itself rather than for services.[5] This point is illus-

_____

[5] Petitioner suggests that the ceding commission is designed in part to reimburse the ceding company for the deductible, administrative costs it originally incurred in issuing the policies. Even assuming this is so, however, petitioner's argument confuses the character of the payment to the taxpayer with its function to the seller. Whether the payment represents a partial reimbursement of deductible expenses to the seller is not pivotal, for as respondent points out, that is often the case with capital assets. See Brief for Respondent 19, n. 11. The important point is not how the purchase price breaks down for the seller but whether the taxpayer is investing in an asset or economic interest with an income-producing life that ex-

trated by a comparison with risk-premium insurance, which is in effect like a direct insurance contract between the reinsurer and the ceding company. In risk-premium reinsurance, the reinsurer does not acquire a future stream of income extending beyond the 1-year term of insurance; rather, in exchange for a premium, it agrees to indemnify the ceding company against liability to its policyholders. Not coincidentally, risk-premium reinsurance agreements typically do not involve the payment of ceding commissions. See n. 1, *supra*.

Finally, even if we were to accept petitioner's arguments about the resemblances between direct insurance and indemnity reinsurance, it would not undermine the basic character of the ceding commissions at issue here as capital expenditures. Petitioner's argument at most proves only that Congress decided to carve out an exception for agents' commissions, notwithstanding their arguable character as capital expenditures. We would not take it upon ourselves to extend that exception to other capital expenditures, notwithstanding firmly established tax principles requiring capitalization, where Congress has not provided for the extension.[6]

We therefore agree with respondent that the ceding commissions paid in respect of indemnity reinsurance, like those involved in assumption reinsurance, represent an investment in a future income stream. The general tax treatment of this sort of expense is well established. Both the Code and our cases long have recognized that amounts expended to acquire an asset with an income-producing life extending substantially beyond the taxable year of acquisition must be capital-

tends substantially beyond the taxable year. For this reason, contrary to JUSTICE STEVENS' suggestion, see *post*, at 261, n., whether the receipt of the ceding commission creates a capital gain for the ceding company is of no relevance in this case.

[6] Likewise, we do not mean to imply that other expenses that do bear a greater resemblance to agents' commissions *would* be currently deductible, notwithstanding the strictures of the Code. We confront today only the specific tax treatment of ceding commissions for indemnity reinsurance.

ized and amortized over the useful life of the asset. See 26 U. S. C. § 263 (1970 ed. and Supp. V.); *Commissioner* v. *Idaho Power Co.*, 418 U. S. 1, 12 (1974); *Woodward* v. *Commissioner*, 397 U. S. 572, 575 (1970); see also *Massey Motors, Inc.* v. *United States*, 364 U. S. 92, 104 (1960) (the basic purpose of capitalization rules is to "mak[e] a meaningful allocation of the cost entailed in the use . . . of the asset to the periods to which it contributes [income]"). Our agreement with respondent as to the character of ceding commissions therefore resolves this case, absent some specific statutory provision indicating that ceding commissions for indemnity insurance are an exception to the general rule for which Congress has authorized current deduction. Petitioner offers three possible sources in Subchapter L of such a specific authorization.

We consider first petitioner's contention that the commissions are currently deductible under § 809(d)(12) of the Code. That provision authorizes deductions for "ordinary and necessary" business expenses as described in § 162(a). It is § 809(d)(12) upon which direct insurers rely in deducting the commissions paid to their agents. Petitioner argues that there is no distinction in Subchapter L between direct insurance and indemnity reinsurance, and therefore that the allowance for direct insurers applies in the latter context as well. This argument, in other words, is the statutory hook upon which petitioner hangs its general submission that its ceding commissions should receive the same tax treatment as the agents' commissions paid by direct insurers.

Were we to agree with petitioner's general premise, § 809(d)(12) would be a logical source of authority to deduct ceding commissions as ordinary and necessary business expenses. But since we have rejected petitioner's efforts to analogize ceding commissions to agents' commissions paid in a direct insurance setting, we necessarily reject its argument that § 809(d)(12) authorizes the deduction petitioner claimed. That section does permit petitioner to deduct ordinary and

necessary business expenses such as salaries and certain administrative costs, but the ceding commissions at issue in this case do not fall in that category.

Petitioner also relies on § 818(a) of the Code, which requires a life insurance company to compute its taxes in a manner consistent with the accounting procedures established by the National Association of Insurance Commissioners (NAIC) for purposes of preparing an annual statement, except when such procedures would be inconsistent with accrual accounting rules. See *Commissioner* v. *Standard Life & Accident Ins. Co.*, 433 U. S. 148, 158–159 (1977). Petitioner points out that NAIC practices prescribe the current deduction of ceding commissions, and argues that the Code, through § 818(a), incorporates the same prescription. In the first place, we think petitioner's argument begs the question. Treasury Regulations require accrual taxpayers to amortize the expenses of procuring intangible assets that produce economic benefits extending over more than one year. Thus, § 1.461–1(a)(2) of the Treasury Regulations, 26 CFR § 1.461–1(a)(2) (1988), entitled "Taxpayer using an accrual method," provides that "any expenditure which results in the creation of an asset having a useful life which extends substantially beyond the close of the taxable year may not be deductible, or may be deductible only in part, for the taxable year in which incurred."[7] Since NAIC practices do not apply where their application would be inconsistent with accrual accounting rules, they are inapposite if a ceding commission is prop-

---

[7] Petitioner suggests that § 1.461–1(a)(2) is not an accrual accounting rule because its prescription applies equally to cash-basis taxpayers. Under petitioner's argument, NAIC accounting principles would dictate all questions of accounting save in those rare instances where Congress or the Commissioner had promulgated a special rule applicable only to accrual-basis taxpayers. We decline to interpret a statutory provision requiring life insurance companies to compute their taxable income "under an accrual method of accounting," § 818(a)(1), to prescribe application of the rules of accrual accounting only to the extent that they are inconsistent with the rules of cash-basis accounting.

erly characterized as an "expenditure which results in the creation of an asset having a useful life which extends substantially beyond the close of the taxable year." Petitioner's contention that § 818(a) justifies the deduction therefore loops back into its general contention that ceding commissions are up-front expenses rather than capital expenditures, a contention which we have rejected.

More important, petitioner's argument rests on an unduly expansive reading of the reference to the NAIC in § 818(a), one that would trump many of the precise and careful substantive sections of the Code. Under petitioner's interpretation, the fundamental question whether an expense is properly characterized as a capital outlay which has to be amortized or instead as an ordinary business expense subject to immediate deduction would be answered by simple reference to accounting procedures in the industry. It is inconceivable that Congress intended to delegate such a core policy determination to the NAIC. Indeed, under petitioner's argument, it appears that ceding commissions for assumption reinsurance, no less than those for indemnity reinsurance, should be immediately deductible because NAIC accounting principles appear not to distinguish between the two kinds of ceding commissions. See Patterson, Underwriting Income, in Reinsurance 539 (R. Strain ed. 1980). Yet it is common ground among the parties that ceding commissions for assumption reinsurance must be amortized, regardless of the treatment they are accorded under NAIC accounting. As this point suffices to illustrate, petitioner's interpretation of § 818(a) proves too much.

Petitioner's remaining statutory argument, based on § 809 (c)(1) of the Code, is more difficult to dismiss. As part of their computation of gains from operations, life insurance companies must calculate the gains from several designated categories, including "Premiums." Section 809(c)(1) provides the somewhat complicated formula governing gains

from premiums. The provision instructs the company to take into account

> "[t]he gross amount of premiums and other consideration (including advance premiums, deposits, fees, assessments, and consideration in respect of assuming liabilities under contracts not issued by the taxpayer) on insurance and annuity contracts (including contracts supplementary thereto)."

From this amount the taxpayer is then to subtract

> "return premiums, and premiums and other consideration arising out of reinsurance ceded. Except in the case of amounts of premiums or other consideration returned to another life insurance company in respect of reinsurance ceded, amounts returned where the amount is not fixed in the contract but depends on the experience of the company or the discretion of the management shall not be included in return premiums." 26 U. S. C. § 809(c)(1) (1970 ed.).

The sum of the amounts identified in the first clause of the provision minus the amounts excluded in the second part of the provision represents the gross amount of premium income earned by a life insurance company. This figure is then added to the other sources of income identified in §§ 809(b) and (c), and from that total the life insurance company subtracts any allowable deductions identified in § 809(d). The result represents the company's net gain or loss from operations, which is the basis of its tax bill. In this way, the items identified in the latter part of § 809(c)(1) which are subtracted from premium income contribute eventually to a reduction in the insurance company's taxable income.

Petitioner contends that § 809(c)(1) allows it to subtract the ceding commissions it pays for indemnity reinsurance from its premium income in either of two ways. The commissions, petitioner argues, qualify under the latter part of § 809(c)(1) both as "return premiums" and as "premiums and

other consideration arising out of reinsurance ceded." In construing the statutory phrase "return premiums," petitioner relies on the definition of that phrase in the Treasury Regulations. Title 26 CFR § 1.809–4(a)(1)(ii) (1988) provides:

> "The term 'return premiums' means amounts returned or credited which are fixed by contract and do not depend on the experience of the company or the discretion of the management. Thus, such term includes amounts refunded due to policy cancellations or erroneously computed premiums. Furthermore, amounts of premiums or other consideration returned to another life insurance company in respect of reinsurance ceded shall be included in return premiums."

Thus, to compress petitioner's labyrinthine statutory argument, petitioner should prevail in this case if ceding commissions for indemnity reinsurance are fairly encompassed in either the statutory term "premiums and other consideration arising out of reinsurance ceded" or the regulatory definition "consideration returned to another life insurance company in respect of reinsurance ceded."[8]

It cannot be denied that the language on which petitioner relies, taken in isolation, could be read to authorize the tax treatment it seeks. Ceding commissions for indemnity reinsurance might loosely be described as consideration "arising out of" or "in respect of reinsurance ceded." But when the statutory and regulatory language is parsed more carefully, petitioner's position becomes dubious, and when the language is read against the background of the statutory structure, it becomes untenable.

The difficulty with including ceding commissions within the regulatory definition of "return premiums" is that ceding

---

[8] As petitioner points out, 26 CFR § 1.809–4(a)(1)(iii) (1988) specifies that the term "reinsurance ceded" in § 809(c)(1) includes indemnity reinsurance but not assumption reinsurance.

commissions are not *"returned to"* the ceding company at all. The commissions never belong to the ceding company until they are paid over in exchange for the right to share in the future income from the reinsured policies. The term "return premiums" more naturally refers to premiums that the insuring or reinsuring company has been paid and then must remit to the individual policyholder or ceding company, as, for example, pursuant to an experience-rated refund clause, which readjusts the amounts of policy premiums paid over to the ceding company to reflect unanticipated savings.

As for the statutory language "premiums and other consideration arising out of reinsurance ceded," ceding commissions do not find a snug fit within this phrase either. Unlike individual policyholders and, in the case of risk-premium reinsurance, ceding companies, reinsurers do not pay premiums. Therefore, a plausible reading of this language is that it refers only to payments from the ceding company to the reinsurer, as, for example, when the ceding company is simply passing on premiums it has received from a policyholder but is obligated to deliver to a reinsurer under an indemnity-reinsurance agreement. The "other consideration" phrase, while admittedly open ended, can be read in quite a sensible way as tagalong language that refers to analogous expenditures of this kind, rather than as a broad catchall provision that encompasses payments of any kind from any party. This reading is supported by a comparison with the identical language in the first portion of § 809(c)(1), which also furnishes possible content to "other consideration." That phrase would appear to refer only to incidental items such as "advance premiums, deposits, [and] fees" paid, like premiums, to the reinsurer from the ceding company.

What this closer reading augurs, a broader examination of the statutory structure confirms: ceding commissions are not at all the kind of payments that Congress sought to permit the taxpayer to exclude from gross premiums in § 809(c)(1). In fact, deduction of ceding commissions has nothing to do

with the calculations prescribed by that provision. The purpose of § 809(c)(1) is to ensure that "premium income" is included in a company's tax base and to specify exactly what is and is not encompassed by that term. The provision begins with a general definition of premium income, which it then fine-tunes in the latter part of the section by excluding certain items that might otherwise be considered to come within the general definition. As the Court of Appeals for the Eighth Circuit has written, the latter part of § 809(c)(1) "serves simply to eliminate from the 'gross amount of premiums and other consideration' those portions of premiums received which do not, in the end, 'belong' to the company in question, but which must either be returned to the policyholder or turned over to or shared with another company under an indemnity reinsurance agreement." *Modern American Life Ins. Co.* v. *Commissioner*, 830 F. 2d 110, 113–114 (1987) (footnote omitted).

Thus, we read the latter part of § 809(c)(1) as a fine-tuning mechanism that permits the exclusion from premium income of phantom premiums that might be encompassed within a strict definition of premiums but that in fact never really accrued to the company that nominally receives them. This category might include, for example, experience-rated refunds; or premium payments that have been refunded because of an overcharge or the cancellation of a policy; or premiums that the ceding company has received from policyholders and must pass on to an indemnity reinsurer. See S. Rep. No. 291, 86th Cong., 1st Sess., 39, 54 (1959). But the ceding commissions that are at issue in this case fall well outside what we take to be the intended purpose of the provision, which is to except from the general provision a small, residual category of payments that resemble premiums but do not fairly represent income to the recipient. There is no need for careful delineation of ceding commissions as apart from the general statutory category of premium income, because ceding commissions never would be thought to come

within that category in the first place. Unlike the above examples, ceding commissions bear no resemblance to premiums; rather, they are an up-front, one-time payment to secure a share in a future income stream.

Finally, we note that petitioner's reading of § 809(c)(1) is highly implausible in light of the intricate attention to detail displayed throughout Subchapter L. To accept petitioner's submission, we would have to conclude that Congress subsumed a major deduction within the fine details of its definition of premium income. This would be especially surprising given that § 809(c) in its entirety concerns gross income; deductions are treated in a separate subsection, § 809(d). We find it incredible that Congress, with but a whisper, would have tucked away in the fine points of its definition of premium income a deduction of this magnitude.

## III

We have concluded that ceding commissions are costs incurred to acquire an asset with an income-producing life that may extend substantially beyond one year. General tax principles provide that such costs must be amortized and capitalized over the useful life of the asset, and no specific provision in the Code dictates a contrary result. The judgment of the Court of Appeals therefore is

*Affirmed.*

JUSTICE STEVENS, with whom JUSTICE BLACKMUN and JUSTICE O'CONNOR join, dissenting.

Charting one's course through the intricacies of the Internal Revenue Code on the basis of first principles rather than statutory text can be hazardous. Intuitively, the Court concludes that the ceding commission a reinsurer pays to indemnify a direct insurer on its policy risks constitutes the purchase price for a capital asset because it produces a stream of future income. The same intuition should lead to the conclusion that the commission a direct insurer pays to acquire policies that will bring future profits constitutes a

capital expenditure. Yet everyone agrees that the latter payment is currently deductible. See *ante*, at 250.*

If the Court had begun its analysis with the text of 26 U. S. C. § 809 (1970 ed.) and the regulations promulgated thereunder—instead of waiting until after it had decided the case on its view of first principles to respond to the statutory provision—it might well have recognized the merit in the taxpayer's position. Section 809(c)(1) distinguishes between assumption and indemnity reinsurance, providing that return premiums "arising out of" an indemnity reinsurance transaction are deductible from gross premiums received. See *ante*, at 256. The Treasury Regulations thus confirm that while payments made by an assumption reinsurer for purchases of policies must be amortized, Treas. Reg. § 1.817–4(d)(2)(ii)(B), 26 CFR § 1.817–4(d)(2)(ii)(B) (1988), "consideration returned to another life insurance company [by an indemnity reinsurer] in respect of reinsurance ceded" is immediately deductible from the reinsurer's gross premiums. Treas. Reg. § 1.809–4(a)(1)(ii), 26 CFR § 1.809–4(a)(1)(ii) (1988). There is no warrant in the text for the Court's rulings that assumption reinsurance and indemnity reinsurance should be treated alike for tax purposes, *ante*, at 251, and that experience refunds constitute return premiums while ceding commissions do not. See *ante*, at 257–258. In the context of this transaction, in which the ceding commission was netted against the initial reinsurance premium, the commission quite literally is a sum that the "reinsuring company has been paid and then must remit to the . . . ceding company." *Ante*, at 258. In all events, for the reasons stated in full in Judge Will's opinion for the Court of Appeals for the

---

*Similarly, if a ceding commission constituted a capital asset for the purchaser in an indemnity reinsurance transaction, the receipt of a commission should, at least in some circumstances, create a capital gain for the seller. Yet, as the Commissioner conceded at oral argument, the receipt of the ceding commission is taxable as ordinary income. See Tr. of Oral Arg. 20–21.

Seventh Circuit in *Merit Life Ins. Co.* v. *Commissioner*, 853 F. 2d 1435 (1988), cert. pending, No. 88–955, I would reverse the judgment of the Court of Appeals.